

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

07 CIV 8859

---

LAKEN SHIPPING CORPORATION,

            Petitioner(s),

   -against-

KELLSTONE, INC. and INLAND BULK
TRANSFER CO.,

            Respondent(s).

07 CV _____

### PETITION TO CONFIRM ARBITRATION AWARD

RECEIVED
OCT 1 5 2007
U.S.D.C. S.D. N.Y.
CASHIERS

PLEASE TAKE NOTICE that Petitioner LAKEN SHIPPING CORPORATION ("LAKEN"), by its attorneys MAHONEY & KEANE LLP., seeks confirmation of an arbitration award against Respondents, KELLSTONE, INC. ("KELLSTONE") and INLAND BULK TRANSFER CO. ("INLAND"), and entry of judgment in conformity with the Arbitration Award.

1.    This is a case of admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.    This Court's jurisdiction over this matter is based upon the Federal Arbitration Act, 9 U.S.C. §§1-13, 28 U.S.C. §1333 (admiralty), 28 U.S.C. §1332 (diversity), 28 U.S.C. § 1331(federal question), as well as the Court's pendent, supplementary and ancillary jurisdiction.

3.    The District Court for the Southern District of New York is the proper venue for this matter, as the Arbitral Award in question was made in the Southern District of New York.

4.    Petitioner, LAKEN, is a legal entity engaged in the business of maritime shipping.

5.      Respondents, KELLSTONE and INLAND, are affiliated legal entities formerly engaged in the operation and sale of tugs and barges and currently engaged in other business activities.

6.      Petitioner LAKEN submits the foregoing Petition, seeking an Order from this Honorable Court confirming the referenced Arbitral Award. (See **Exhibit 1**).

7.      The Arbitration in question relates to the sale and transfer of the Tug Boat FRANK PALLADINO, JR ("FRANK PALLADINO" and "Vessel") from Sellers KELLSTONE and INLAND to buyer LAKEN.

8.      Petitioner LAKEN claimed that Respondents KELLSTONE and INLAND breached the Ship Sale Agreement ("SSA") for the Vessel in question by failing to deliver said Vessel in the condition required by the agreement.

9.      LAKEN demanded arbitration pursuant to the arbitration clause contained in the SSA, which directed the parties to arbitrate in New York. Binding arbitration was pursued under the rules of the Society of Maritime Arbitrators ("SMA").

10.     The SMA arbitration panel was assembled. The panel was composed of Mr. Manfred W. Arnold, Mr. David W. Martowski, and Mr. Stephen H. Busch (chairman).

11.     The parties successfully conducted discovery for a period of approximately nineteen months.

12.     The arbitration held a week of hearings on this matter. Following the conclusion of the hearings, the issues were briefed by counsels, and the proceedings were closed.

13.     On September 25, 2007 the arbitration panel issued an Arbitral Award and Decision finding KELLSTONE and INLAND liable under the terms of the SSA. (See **Exhibit 1**).

14. The arbitration panel further found that Petitioner was entitled to an arbitral award of **$ 793,267.44.** (Id.).

15. The terms of the award require that Respondents provide payment within twenty (20) days from the date of the award. Thereafter, interest at 8.25% per annum would accrue on the award until such time as the award was paid or reduced to judgment, whichever occurs first. (Id.).

16. To date, Respondents KELLSTONE and INLAND have not complied with the Arbitration Award and have failed to pay the sum awarded to Petitioner LAKEN.

17. KELLSTONE and INLAND have not sought to vacate, modify, or challenge the Arbitration Award.

18. Pursuant to the Federal Arbitration Act, 9 U.S.C. § 10, Petitioner is entitled to confirmation of the Arbitration Award and entry of judgment in conformity with the award, including the award of interest to Petitioner at a rate of 8.25% per annum from the date of the award until such time as the award is paid or reduced to judgment.

WHEREFORE, Petitioner, LAKEN SHIPPING CORPORATION, seeks an order:

(i)  Confirming the arbitration award against Respondents KELLSTONE INC. and INLAND BULK TRANSFER CO.,

(ii)  Entering judgment in favor of Petitioner LAKEN SHIPPING CORPORATION in the sum of **$ 793,267.44,**

(iii)  Awarding Petitioner interest at 8.25% per annum, from the date of entry of the Arbitration Award until payment or reduction of the award to a judgment, and

(iv)  Providing Petitioner with such other and further relief as the Court deems proper.

Dated:     New York, New York

October _15th_, 2007

Respectfully submitted,

MAHONEY & KEANE LLP
Attorneys for Petitioner LAKEN SHIPPING
CORPORATION

By:  _____

Edward A. Keane (EK 1398)
111 Broadway, 10th Floor
New York, New York 10006
Tel (212) 385-1422
Fax (212) 385-1605
File No. 12/3478

## SERVICE LIST

KELLSTONE, INC. and INLAND BULK
TRANSFER CO.
3203 Harvard Avenue
Newburgh Hts. Ohio 44108

ROETZEL & ANDRESS
Attorneys for Respondents KELLSTONE,
INC. and INLAND BULK TRANSFER CO.
1375 East Ninth Street
One Cleveland Center, Ninth Floor
Cleveland, Ohio 44114

```
*****************************************************
                                                    *
In the Matter of the Arbitration                    *
                                                    *
        between                                     *
                                                    *
LAKEN SHIPPING CORPORATION,                          *
as Claimant                                         *
                                                    *        FINAL AWARD
            and                                     *
                                                    *
KELLSTONE, INC. and INLAND BULK                      *
TRANSFER CO.,                                        *
as Respondents                                      *
                                                    *
Under a Ship Sale Agreement dated                   *
March 3, 2004                                       *
                                                    *
*****************************************************
```

BEFORE:        Manfred W. Arnold
               David W. Martowski
               Stephen H. Busch, Chairman

APPEARANCES:   STRATHY & ISAACS, for and on behalf of Laken Shipping
               Corporation

               by George R. Strathy, Esq. and John Carter, Esq., of counsel

               ROETZEL & ANDRESS, for and on behalf of Kellstone, Inc.
               and Inland Bulk Transfer Co.

               by Ezio A. Listati, Esq. and Christine M. Garritano, Esq., of
               counsel

## INTRODUCTION

This arbitration concerns the liability for what has been described as catastrophic damage to a tugboat's starboard engine and the cost of replacing it. The casualty was sustained on a tug purchased by Claimant from the Respondents.

Claimant also seeks damages for loss of revenue arising from its inability to use the vessel for three months as a result of the casualty.

BACKGROUND

In the latter months of 2003, Kellstone, Inc. and its affiliated company, Inland Bulk Transfer Co. (hereinafter referred to collectively as "Kellstone"), entered into preliminary discussions with Seaway Marine Transport ("Seaway") looking toward the sale of three of Kellstone's tugboats and two of its barges. The vessels had been employed on the Great Lakes, trading in spot and contract business. Seaway is an operating company that owns a 25 percent interest in Laken Shipping Corporation ("Laken"), the claimant in this case. Laken itself was formed in connection with and after the purchase of Kellstone's vessels.  Kellstone was involved in several ventures in addition to its tug and barge business. They included a trucking company, a quarry, a ferry boat company and a large marina on Kelly Island, in Lake Erie. Kellstone also owned a dock in Sandusky, Ohio that it used for discharging armor stone[1] from both its own quarry and that of its principal competitor, LaFarge North America, Inc. ("LaFarge"). Kellstone had been hauling stone for LaFarge for some 12 years, during which time LaFarge had periodically expressed an interest in acquiring Kellstone's quarry. As contemplated during the discussions, the sale of the vessels would be conditioned upon Kellstone's sale or lease of its quarry and stone dock to LaFarge, and Laken's execution of a 10-year contract of affreightment with LaFarge for the transportation of its stone.

---

[1] Armor stone is quarry stone cut approximately four feet by four feet by four feet. It is used, among other things, in the construction of breakwaters. T at 51

Five vessels were involved in the sale: the twin-screw tugs *JAMES PALLADINO, FRANK PALLADINO, JR.* ("the *FRANK PALLADINO, JR.*", or "the vessel") and *BENJAMIN RIDGWAY*, along with two barges, the *KELLSTONE 1* and the *STEVENS 2401* ("the *2401*").[2] Laken's intention was to use the largest tug, the *JAMES PALLADINO*, together with *KELLSTONE 1*, to continue servicing the LaFarge contract as had been done by Kellstone previously. Laken intended to use the *FRANK PALLADINO, JR.* and the *2401* in the spot armor stone trade, as the deck of the *2401* had recently been timbered (at considerable expense) to carry large stone, as well as for other spot business. In addition, Laken was considering using the *FRANK PALLADINO, JR.* instead of the *JAMES PALLADINO* with *KELLSTONE 1*, since the *FRANK PALLADINO, JR.* had apparently been used as the prime mover of the *KELLSTONE 1* for a number of years.

Except for the loss of revenue damages sought by Laken, the dispute in this arbitration concerns events surrounding the engine damage to and sale of the tug *FRANK PALLADINO, JR.*

On October 23, 2003, two Laken employees, Eric McKenzie and Dennis McPhee, inspected the vessel at Kellstone's dock in Cleveland, Ohio. The tug and her barge had just unloaded a cargo of armor stone and were awaiting orders. They inspected the engine spaces, examined and listened to the engines, checked for oil leaks and any abnormal sounds, and found nothing out of the ordinary. They did not

---

[2] The *BENJAMIN RIDGWAY* was a small (48-foot) tug, and plays no role in this dispute. The *FRANK PALLADINO, JR.* was later renamed the *SANDUSKY*: the *STEVENS 2401* was later renamed the *CLEVELAND FLATS*.

open the engines for inspection. However, they noted the engine room was dirty and the vessel suffered from a general lack of good housekeeping. They also noted that the vessel appeared not to have been used on a consistent basis. She had been classed by the American Bureau of Shipping at one time, but her owners had allowed class to lapse. Messrs. McKenzie and McPhee opined that the vessel was worth about $1,500,000.00.

Inspections of the other vessels, negotiations and due diligence efforts continued during the fall of 2003, and on December 30, 2003 Laken and Kellstone signed a Letter of Intent (the "LOI"). The LOI set forth certain conditions that were to be met by the closing date, and an agreed purchase price of $12 million for the five vessels. The portion of the total purchase price that was allocated to the *FRANK PALLADINO, JR.* was $1,850,000.00. The closing date was to be on or before February 29, 2004, unless the parties agreed otherwise. Kellstone was to be responsible for the proper lay-up of the vessels for the 2003-4 winter season, and for maintaining insurance coverage for any damage that might be incurred between December 30 and the closing date. The LOI also warranted that the vessels were in good working order on December 30, and that Kellstone would indemnify Laken for any damage to them arising from improper or inadequate winter lay-up.

On the morning of January 15, 2004, the *FRANK PALLADINO, JR.* and the *2401* were lying at Kellstone's Putnam Street dock in Sandusky. Jeff Gordon, a

Kellstone employee,[3] was allegedly instructed by Kellstone's vice-president, August

Palladino, to start and run the vessel's main engines overnight, "clutched in" at low

rpms in order to break up the ice around the tug and the *2401* so the *2401* could be

moved to the Sandusky coal dock.[4] Gordon's son Aaron, also a Kellstone employee,

was on board as well. According to Gordon, the oil and other fluid levels were

checked prior to starting and again just before he left, about an hour after the engines

were started. Fluid levels were found to be normal on both occasions. Gordon had to

leave the vessel due to another commitment, but left Aaron aboard to keep an eye on

things. His son called him early that evening to inform him that the starboard engine

had shut down and would not turn over. According to Gordon, he promptly

informed Palladino, who ordered that the boat not be moved, and that everything on

board be shut down. The following morning, Gordon returned to the tug with two or

three other Kellstone employees and attempted unsuccessfully to start the engine. It

was not even possible to "bar" the engine over, because it was completely seized.[5] At

that time they noted the oil level was low, and according to Gordon an open valve in

the oil line was found under a deck plate. They surmised that this valve had vibrated

open and allowed the oil to drain out of the system. The engine room alarm system,

which would have sounded a siren to warn of low oil levels or pressures, and, if the

problem were not remedied, automatically shut the engines down, was not

---

[3] Gordon was later hired as a Port Engineer by Laken after the sale and transfer of the vessels had been completed. T at 187-188

[4] The coal terminal apparently used the *2401* from time to time because its wooden decking was an ideal platform on which to lay its loading chute for maintenance work. T at 194. Palladino stated that he never instructed Gordon to move the *2401* to the coal dock. Palladino, T at 514-15.

[5] In this procedure, a steel bar is inserted in a slot on the flywheel and used as a lever to turn the flywheel manually.

functioning and had not functioned for some time. The vessel was shut down after the incident and was not moved for the remainder of the winter.

Laken was not informed of this casualty when it occurred.

As part of the due diligence process, on January 21 and 22, Laken engaged a diving company to make underwater inspections of all five vessels and determine their hull conditions below the waterline. The inspections were attended by representatives from both buyer and seller. The *FRANK PALLADINO, JR.* and the *2401* were inspected on January 22, and a videotape was made of the inspection. Present that day were Bernie Johnson, representing Laken, and Scott Stevenson, John Wolf and Denny Bias, all employees of Kellstone. Nothing out of the ordinary was found. During the inspection the diver was asked by Stevenson to carefully check in way of the starboard propeller, shaft and Kort nozzle to see if a piece of rope, chunk of ice or other foreign object might have jammed the propeller and caused the engine to shut down on January 15. However, all of these areas were found to be entirely free of debris or other obstructions.

A Ship Sale Agreement (the "SSA") embodying key terms of the LOI was drafted and signed by the parties on March 3, 2004. March 3 was also the closing date, and the assets were transferred to Laken on that day. Laken asserts that it did not learn of the damage to the starboard engine of the *FRANK PALLADINO, JR.* until about two weeks after the closing. Kellstone disputes this, however, and argues that Laken became aware of it at least on January 22, during the course of the underwater inspection. This issue will be dealt with later in the Award.

Between April 18 and April 21, 2004 an extensive survey was made of the starboard engine by an engineer from Wartsila North America, Inc., acting for Laken.[6]  Between January 11 and February 22, 2005, two further surveys were conducted, one by North American Marine, Inc. ("NAM"), also acting on behalf of Laken, the other by SEA, Ltd. on behalf of Kellstone.  All three surveys revealed that the engine had suffered severe damage due to the failure of a bushing on the speed-up gear shaft of the blower gear train at the rear of the engine, which allowed the gear shaft to drop out of alignment. The resulting damage to the gears caused metal particles from the gear teeth to circulate in the lubrication system, whence they were carried via the oil channels throughout the entire engine. During this process, bearing clearances would have increased as material was eroded, causing the oil pressure to drop.[7] Finally, the abrasive action of the metal particles destroyed the main bearings, causing the engine to seize. The internal damage to the engine was so extensive that the recommended course of action was to replace it rather than attempt to repair it.[8] On May 5, 2004, Wartsila submitted an estimate of $344,000 for the replacement of the ruined engine with a reconditioned one, excluding the cost of shipyard labor, ChockFast[9] and unforeseen difficulties. The engine replacement work was not done, however, nor was the vessel used during the 2004 shipping season, and Laken

---

[6] Both port and starboard main engines on the *FRANK PALLADINO, JR.* were Wichmann Model 4AXA 1200 HP turbocharged diesels manufactured in Norway by Wartsila.

[7] SEA Survey Report, Joint Book of Documents ("JBD") at Tab 15(1).

[8] Letter from Matts Andersson, Sales Manager (Service), Wartsila NA, Applicant's Book of Documents ("ABD"), Tab 12. The letter also noted with respect to overhauling the port engine that it had been run with water in the oil. Andersson also testified at the hearings.

[9] ChockFast is the brand name of a resin used to bed the engine to its foundation once it is aligned. T at 324

ultimately decided to repower the vessel completely with Caterpillar engines. This work was undertaken during 2005.

On or about May 3, 2004, Laken gave notice in writing to Kellstone of the damage, holding them entirely responsible for it. Kellstone denied all liability, following which, on June 28, 2005, Laken demanded arbitration pursuant to the arbitration clause contained in the SSA. The arbitration panel was constituted on September 1, 2005.

At some point after the casualty occurred, Kellstone presented a claim for the damage to its underwriters. On December 6, 2005, however, the underwriters denied the claim, and on March 1, 2006 Kellstone filed suit against them.

PROCEEDINGS

On September 13, 2005, alleging that the terms of the arbitration clause and the Society of Maritime Arbitrators ("SMA") Rules incorporated by reference therein had not yet been met by Laken, Kellstone asked the panel to stay the proceeding until such time as they were. The matter was thoroughly briefed by counsel, following which the request was denied.[10] On March 8, 2006, Kellstone requested the panel to stay the arbitration pending resolution of the litigation against its underwriters. On March 22, 2006, after extensive briefing by counsel, the panel denied the request.[11] On December 18, 2006, Kellstone engaged Roetzel & Andress LPA to replace Benesch Friedlander Coplan and Aronoff LLP, who had represented Kellstone since the beginning of this arbitration. Discovery of documents continued from September

---

[10] Interim Ruling issued by the panel on November 20, 2005.
[11] Ruling issued by the panel on March 22, 2006.

2005 until April 2007. A list of 18 fact and expert witnesses was developed, and the

panel set aside a week in April 2007 to take their testimony. Because the parties, their

counsel and most of the witnesses were located in or not far from Cleveland, the

arbitrators agreed to hold the hearings in Cleveland.[12] Prior to the hearings, counsel

provided an agreed procedural outline to be followed, as well as written summaries of

the testimony to be given by each of their respective witnesses.

On March 19, 2007, Kellstone requested summary judgment in its favor,

contending it had introduced sufficient evidence to demonstrate the absence of any

material issues of fact as a matter of law, and that even by construing the facts under

the most favorable light to Laken, there could be no liability on the part of Kellstone.

On April 2, Laken submitted a reply urging Kellstone's request be denied, and cross-

moved for summary judgment in its favor.  On April 6, the panel denied both

Laken's and Kellstone's requests.

Following the conclusion of the hearings, the issues were briefed by counsel,

and the proceeding was closed. By agreement, no reply briefs were exchanged.

CLAIMS

Laken seeks an award of direct damages in the amount of $520,314.83, which

it contends would have been the cost of removing the starboard engine from the

*FRANK PALLADINO, JR.* and replacing it with a reconditioned engine from

Wartsila.[13]  In addition, Laken seeks damages for loss of revenue in the amount of

---

[12] Despite the Patriot's Day no'theaster that severely disrupted travel in the Northeast the day before, the hearings began the following day on schedule.

[13] Applicant's Breakdown of Damages, items A-C. Applicant withdrew three items from its claim that were associated with the installation costs of the Caterpillar engines in 2005.

$395,655.30, which it represents is the amount the tug could have earned during the three-month period it estimates would have been necessary to procure and install a replacement engine from Wartsila in the spring of 2004. Laken also seeks interest on these sums at 5 percent per annum, recovery of its attorneys' fees in the amount of $157,910.37, costs in the amount of $36,363.62 and an assessment of the arbitrators' fees and expenses against Kellstone.[14]

Kellstone denies all liability in the matter and seeks an assessment of its attorneys' fees and costs in the amount of $289,599.90[15] against Laken.

DISCUSSION

Liability

Although the parties disagree as to who bears the liability for replacing the starboard engine on the *FRANK PALLADINO, JR.*, there is no dispute that the casualty to the engine occurred on January 15, 2005, or that the engine was essentially destroyed.

It is Laken's position that the terms of the SSA are clear and unambiguous, and with particular reference to Sections 5.1, 11.1, 11.2, 11.4 and 11.5, there can be no doubt as to Kellstone's liability for the costs of replacing the engine. A recitation of all the relevant SSA terms may be found in Appendix A of the Award, but the relevant portions of the five clauses referred to above bear repeating here:

---

[14] Strathy & Isaacs statement and breakdown of costs dated May 16, 2007.
[15] Of this total amount, $100,863.75 and $39,217.71 represent attorneys' fees and expenses, respectively, that were incurred by Benesch Friedlander. Also included in the total is Roetzel & Andress's deposit of $10,000 to the SMA Escrow Account for arbitrator fee security.

"5.1 The vessels shall be delivered to Purchaser and taken over safely afloat at the Time of Closing, in substantially the same condition as at the time of inspection by the Purchaser, fair wear and tear excepted..."

"11.1 The Vessels, together with everything belonging to them, shall be at the Vendor's risk and expense until the Time of Closing."

"11.2 Until the Time of Closing, the Vendors shall maintain hull and machinery insurance on each Vessel..."

"11.4 In the event that any substantial damage occurs to any Vessel prior to the Time of Closing which materially affects the condition of such vessel, Purchaser may...at its option, either decline to complete the transaction with respect to such Vessel...or accept an assignment from the Vendors of the insurance proceeds..."

"11.5 The Vendors shall indemnify the Purchaser against any damage caused to the vessels as a result of improper or inadequate lay-up...Promptly after the discovery of such damage, but in no event later than one (1) month after the discovery of such damage, the Purchaser shall provide the Vendors with notice thereof and an opportunity to inspect such damage."

Laken contends that for the purposes of determining the general condition of the vessel and its machinery, the relevant inspection of the *FRANK PALLADINO, JR.* occurred on October 23, 2003 and not on January 22, 2004 as alleged by Kellstone. At that time, Laken was satisfied that the engines were in satisfactory operating condition and that the vessel was acceptable for its purposes, despite the observation that it suffered generally from a lack of good housekeeping. Hence, because the casualty occurred on January 15, while the vessel was in the possession of and under Kellstone's control, Laken argues that Kellstone must bear the responsibility for the casualty. Kellstone disputes this, contending that the underwater inspection of the vessel conducted on January 22 and attended by Laken's representative was the relevant inspection under the terms of Paragraph 5.1. Kellstone further argues that it informed Laken that there was something wrong with the starboard engine that day. Therefore, Laken must be presumed to have been aware of the damage and, because it made no protest or further investigation at that

time, waived its rights to claim damages for the repair or replacement of the engine. In addition, Kellstone points out that under Paragraph 5.3, the vessels were to be delivered on an "as is, where is" basis. Hence, if the relevant inspection the *FRANK PALLADINO, JR.* is determined to be the one that occurred on January 22, i.e., after the engine casualty, then Kellstone would have, in fact, delivered the vessel "as is" in compliance with Paragraph 5.3. Furthermore, Kellstone contends that, in any event, the failure of the bushing on the speed-up gear shaft of the engine was not the result of any lack of maintenance, but of normal wear and tear, which was expressly excepted in Paragraph 5.1.

The first question to be addressed is whether the relevant inspection of the vessel, its engines, machinery and other equipment took place on October 23, 2003 or on January 22, 2004. Kellstone's arguments that it was on January 22 are not persuasive, because the overall inspection of the vessel undertaken by Laken's representatives on October 23 had already satisfied them that there were no major deficiencies with the engines, equipment, other machinery or crew spaces. Because the vessel was in service at that time, the hull below the waterline could not be inspected. Hence, it would not be at all unreasonable to infer that the purpose of the January 22 inspection was only to determine the underwater condition of the hulls of the *FRANK PALLADINO, JR.* and the *2401*. Moreover, according to Gordon, on instructions from either Scott Stevenson or Augie Palladino following the January 15 incident everything on the vessel had been shut down, all fluids had been drained and the machinery, including the generators and compressors, had been winterized. The

deposition of Mark Stevenson, Scott's brother, supports this.[16]  Therefore, it is evident that even if Bernie Johnson, Laken's representative at the underwater inspection on January 22, had requested that the engines be run that day, Kellstone would not have been able to start them without first de-winterizing both main engines and their auxiliaries.  From the evidence, it is clear to us that the relevant inspection of the vessel's machinery occurred on October 23, not on January 22.

With respect to the winterizing, there is also evidence to suggest that the *FRANK PALLADINO, JR.* may not have been properly winterized. In February 2005, Kevin Cameron, a surveyor employed by NAM, attended the dismantling of the starboard engine on behalf of Laken. Other interests were in attendance as well, including Ricky Stansifer, a surveyor employed by SEA, who was acting on behalf of Kellstone.  During the dismantling operation, a crack was discovered on the coolant side of the turbocharger, and while this was not the acknowledged cause of the engine failure, Cameron noted in his report,

> "It was reported that immediately after the alleged incident, the engineer in charge of watch was instructed to leave the vessel as is. Evidence of frozen pipelines, remaining frozen cooling water in pump housings and the crack located in the water-cooled side of the turbocharger indicates that proper draining of the cooling water systems was not carried out. The result of the improper winterizing of the vessel contributed to the damage found to the auxiliaries associated with the starboard main engine."[17]

It is not clear from where or from whom "it was reported", but the material elements of Cameron's finding were not challenged by Kellstone[18] and point to its failure to lay the vessel up properly as was required by Paragraph 3(b) of the LOI.[19]

---

[16] Deposition of Mark Stevenson, 9 (20-23); 26 (5-8).
[17] JBD tab 14(10).
[18] Cameron, T at 387; Palladino, T at 515-17; Stansifer, T at 657

Kellstone also argues that because it informed Laken on January 22 that the starboard engine "had shut down", and because no obstructions were found in the propeller or Kort nozzle, it was Laken's duty to make a further investigation of the cause of the shutdown. Having not done so, Laken must be deemed to have accepted the vessel "as is" pursuant to Paragraph 5.3 of the SSA, and waived any further right to make a claim against Kellstone for the damage. Given the terms of the SSA, this argument is also unpersuasive.

Paragraph 5.3 states

"Except as otherwise specifically stipulated in this Agreement, the Vessels shall be delivered by the Vendors and accepted by Purchaser on an "as is, where is" basis."

The panel finds that the provisions of Paragraph 5.1, *supra*, do not conflict with the provisions of Paragraph 5.3, because having determined that the relevant inspection of the *FRANK PALLADINO, JR.* occurred on October 23, the "as is" reference within Paragraph 5.3 must refer to the vessel's condition on October 23, not its condition on January 22. Moreover, there is certainly no lack of clarity, nor any ambiguity in Paragraph 11.1, which places the risk and responsibility for all of the assets upon Kellstone until the closing.

The last question we must address with respect to the issue of liability is whether the damage to the engine was the result of "normal wear and tear", which was an excepted condition of the vessel's delivery under Paragraph 5.1. Laken contends that the engine casualty was clearly the result of poor maintenance and/or

---

[19] The SSA provided only that Kellstone indemnify Laken against damage due to improper lay-up (11.5). While the SSA (1.2) superseded and nullified the LOI, it must be remembered that at the time of the engine casualty the parties' rights and obligations were governed by the LOI.

negligence. Kellstone's argument that the cause was normal wear and tear rests largely in the report and testimony of Ricky Stansifer, the SEA surveyor who acted on its behalf. Stansifer concluded that there was a gradual deterioration of a shaft bearing in the blower gear train. Both parties characterized the damage to the engine as "catastrophic", and virtually everyone ultimately agreed that the failure of this bearing was the cause of the damage. But even Stansifer acknowledged that the bearing should have lasted thousands of hours in normal service, although he stated that once the "first layer" was eroded, further deterioration would be rapid.[20]

The evidence showed that although a complete overhaul of the starboard engine had been performed by Wartsila two or three years prior to the casualty, record-keeping of engine maintenance since the overhaul had been informal and consisted more or less of hand-written notes in a journal notebook of events, such as when oil was changed, when the vessel tied up, and fueling records. Perhaps the most compelling argument against Kellstone's contention that the damage was a result of normal wear and tear was the unchallenged fact that key components of the engine alarm system had either been intentionally disabled or did not work. Properly operating, the alarm system would have first alerted the duty engineer both visibly and audibly to a low oil and/or low oil pressure condition, so that immediate steps could be taken to correct the problem or shut down the engine. In the event nothing was done, the system would then have automatically shut the engine down before such severe damage as was done in this case could occur. Moreover, as even

---

[20] Stansifer, T at 659, 678-80. Ricky Stansifer stated that he had a lot of experience with automobile and truck diesel engines, but was not a marine engineer. He had no experience whatsoever with Wartsila/Wichmann engines prior to this case.

Kellstone's surveyor testified, when there is such low oil pressure as to cause the engine to begin to seize, there would "…be some god-awful terrible noises."[21] It is to be remembered that the only person "on duty" at the time of the casualty was Gordon's 24-year-old son Aaron, whose only experience consisted of "on-the-job" training.  He did not have an engineering license or certificate, nor did he have an engineering education. From this we can only infer that he did not possess the knowledge or experience to deal with the situation or prevent the severe damage that occurred. It is clear from the evidence, however, that this casualty was the result of negligence, not normal wear and tear.

Finally, we are compelled to address Kellstone's argument that had Laken carried out a bore-scope and gear-lash test on the engines, the problem with the blower gear train bearing would have been discovered and could have been corrected before any damage occurred.[22] Although, according to the testimony, performing these tests might possibly have brought the problem to light early enough to have averted the casualty, Laken was under absolutely no legal or contractual obligation to perform them as part of its due diligence as purchaser. Nor does the liability for the engine damage fall upon Laken because it did not perform the tests. Under the SSA, all risk was to be borne by Kellstone until the closing. For these and other reasons as set forth above, the liability for the engine failure on the *FRANK PALLADINO, JR.* must be borne by Kellstone.

---

[21] Stansifer, T at 684.
[22] A bore-scope is an optical device with a long, flexible tube with a light that enables a technician to inspect some of the interior components of an engine without dismantling it. In a gear-lash test, the clearances between meshing gear teeth are measured to determine whether there is excessive wear. Gomez, T at 290-91, 294.

<u>Damages</u>

Having found Kellstone liable for this casualty, under the principle of damages, Laken is entitled to be returned to the same financial position it would have enjoyed had the casualty not occurred. Laken argues that this includes not only replacement of the engine itself, but lost profits during the time the vessel would have been out of service while the engine was replaced. Kellstone contends it is not liable for any damages because Laken had already expressed its intent to repower the *FRANK PALLADINO, JR.* with Caterpillar engines before it became aware of the damage to the starboard engine, and even before the SSA was concluded. In this respect, Kellstone refers to two conversations, one between Bernie Johnson and Joel Frazier on January 22, 2004, and another between Augie Palladino and Gerry Gramenos at a celebration luncheon on March 3, the day the SSA was closed.[23] Kellstone argues that these conversations clearly indicate that Laken was not concerned with the condition of the tug's engines. Not only is the testimony surrounding both conversations vague and ambiguous, however, but given the established facts that Laken paid for a tugboat in working condition on March 3, but received one that was not in working condition, we fail to see the relevance of Kellstone's argument. In addition, Eric McKenzie, who inspected the vessel on October 23, 2003, stated that Laken intended to restore the vessel's expired ABS class certificate, which would require a survey and overhaul of the engines at an estimated

---

[23] Joel Frazier was the dive supervisor on the day the underwater inspections of the *2401* and the vessel were conducted.

cost of $75,000 each after the winter lay-up period.[24] Moreover, after discovering the damage to the starboard engine, Laken engaged Wartsila to survey both engines. Wartsila furnished alternative estimates both for repairing and replacing the starboard engine and for overhauling the port engine. If, as argued by Kellstone, Laken's intention all along was to repower the vessel, then Laken's actions, and the costs that it incurred in this respect make no sense.

Kellstone also contends that because Laken sold the vessel for a profit in 2006, it has suffered no loss and is not entitled to any damages. The rationale behind this argument is based upon the vessel's sale price of $3,600,000, less the price Laken paid for it ($1,850,000) and less the cost of repowering it ($1,254,815), which results in an alleged profit of $495,185.[25] However, what Kellstone's argument fails to take into account is that the price Laken paid for the *FRANK PALLADINO, JR.* was for a tug with two working engines. It does not consider what it would have cost to replace the starboard engine with a reconditioned Wichmann, or the other upgrade work undertaken by Laken before it sold the vessel. From the evidence, these costs were in excess of the profit Kellstone alleges accrued to Laken.

For the foregoing reasons, the panel finds Kellstone liable for the cost of replacing the starboard engine, including the removal and disposal of the damaged one, as well as all other associated costs. We have examined the documents submitted by Laken and are satisfied as to the correctness of the amounts claimed, and that they include no costs associated with repowering the vessel in 2005. Accordingly, we

---

[24] Eric McKenzie, Applicant's List of Witnesses and Witness Statements, 2(8); T at 69-71.
[25] Report of Gregory Davis, JBD Tab 16, p.7.

award damages of $520,314.83 to Laken as set forth in detail in its Statement of Damages.

A separate part of Laken's damage claim relates to lost revenue during the period following the opening of the Lakes season in 2004, when the tug could not be put in service due to the engine casualty. Laken argues that it would be reasonable to allow a period of about three months to obtain, ship and install a replacement engine. As for the revenue that could have been generated during that period, Laken considers as representative a September 2005 contract concluded with GE Energy to move windmill components from Milwaukee, Wisconsin to Oswego, New York. That contract generated $4,396.17 per day in net revenue. Laken also asserts that had the tug been available, they could have employed it for 150 days during the 2004 season. Kellstone, however, contends that the tug lost approximately $1 million annually during the three years preceding its sale to Laken. Therefore, under New York law, no damages for lost revenue are warranted because they could not have been foreseen by the parties at the time of contracting.[26] In addition, Kellstone argues that during the due diligence period, Laken did little or no research concerning the earning history of the *FRANK PALLADINO, JR.*, focusing instead on the *JAMES PALLADINO* and the *KELLSTONE 1* which were to service the long-term LaFarge contract. Moreover, Kellstone points out that Laken acknowledged the *FRANK PALLADINO, JR.* appeared to have been used on an inconsistent basis,

---

[26] Paragraph 1.6 of the SSA provides for the application of the laws of the State of New York.

and that Laken intended to use the vessel mainly as a backup for the *JAMES PALLADINO*.

The panel is unpersuaded by Kellstone's argument with respect to the tug's earnings history. Clearly, Laken was purchasing the vessel for the purpose of generating revenue, whether on the spot market or as backup for the *JAMES PALLADINO*, or in some combination thereof. Nevertheless, Laken must still demonstrate the level of the tug's earning potential, that the vessel could have been employed and the amount of net revenue that employment would have generated during the period of time it would have taken to replace the starboard engine after the damage was discovered.

Dennis McPhee, who was principally responsible for marketing the *FRANK PALLADINO, JR.* and *2401*, testified at some length about his efforts to find employment for them.[27] In his Summary of Evidence he stated that marketing efforts for the vessels began "...once the repair plan was completed..." when a brochure was developed and distributed to some 65 potential users, in addition to press releases in trade publications and information on Laken's website.[28] A local expert in the aggregates trade was also retained to assist with marketing. McPhee's Summary of Evidence also stated that Laken began receiving enquiries for potential employment of the vessels late in 2004, listing 15 different companies with whom specific business opportunities were discussed.[29] Although McPhee testified that

---

[27] Refer generally to Laken's Breakdown of Damages, Tab 13, and McPhee's testimony, T at 122-186.
[28] It is unclear what McPhee meant by "the repair plan", as it is clear that no repairs to the tug were ultimately undertaken.
[29] The list included the windmill business concluded with GE Energy at the end of 2005.

freight rates were also quoted, no voyage or P & L calculations were provided as support for any potential revenue from any of them. Mcphee also acknowledged that the reason at least some of the potential employment in the spring of 2004 did not materialize was because Laken's rates were too high.[30] Despite Laken's marketing effort, it was clear from McPhee's testimony that the only employment Laken ever concluded for the *FRANK PALLADINO, JR.* and the *2401* was the profitable GE windmill contract that was performed in September 2005, after the *FRANK PALLADINO, JR.* had been repowered. However, we find that this employment does not fairly represent what the tug could have earned between March and May 2004, and is an inappropriate benchmark for Laken's damage claim in this respect. The law extends certain latitude to the trier of facts who "may make a just and reasonable estimate of such damages based on relevant data and render its verdict accordingly."[31] With respect to the quality of proof required, it was stated in *Palmer* v. *Connecticut Ry. Co.:*[32]

> "The ways compensatory damages may be proven are many. The injured party is not to be barred from a fair recovery by impossible requirements. The wrongdoer should not be mulcted neither should he be permitted to escape under cover of a demand for nonexistent certainty.

No impossible requirements were imposed in this case. In part, the inability to come up with potential earning values may have been the fact that the tug was inoperative at the time for which we would have allowed damages. Therefore, because Laken has

---

[30] McPhee, T at 167.
[31] *Gardner* v. *M/V Calvert*, 1958 AMC 800, 808 (3rd Cir. 1958)
[32] 311 U.S. 544, 560 (1941)

been unable to show that any realistic employment opportunities were lost during the period in question, we must deny its claim for damages in this respect.

In addition to the damages awarded, Laken is entitled to compensation for the loss of use of this money.  Accordingly, we grant Laken's request for prejudgment interest at the rate of 5% per annum, from March 3, 2004 to the date of this award.

The panel finds compelling cause in this case to direct that Kellstone bear its own attorneys' fees and costs, and to grant Laken an allowance of $160,000 towards its attorneys' fees and costs.

The fees of the arbitrators are assessed 80% against Kellstone and 20% against Laken.  The manner in which they are to be settled is set forth in Appendix B, which is attached and forms an integral part of this award.

## AWARD

The panel directs Kellstone to pay to Laken the amount of $793,267.44, which we arrive at as follows:

| | |
|---|---|
| Cost to replace the starboard engine on the *FRANK PALLADINO, JR.* | $520,314.83 |
| Interest on engine replacement cost at 5% per annum from 3/3/04 to 9/25/07 | $ 92,730.08 |
| Allowance for Laken's Attorneys' fees and costs | $160,000.00 |
| Reimbursement of Arbitrators' fees and expenses paid on Kellstone's behalf [33] | $ 20,222.53 |
| Total due to Laken | $ 793,267.44 |

---

[33] See Appendix B

If the above amount is not paid within 20 days from the date of this Award, interest at the rate of 8.25% per annum shall continue until the date it is paid, or reduced to judgment, whichever first occurs.

Pursuant to the arbitration provision of the SSA and Title 9 USC, §1 *et seq.*, this Award may be reduced to judgment in any Court of competent jurisdiction.


Manfred W. Arnold


David W. Martowski


Stephen H. Busch, Chairman


New York, New York
September 25, 2007

```
*****************************************************        *
                                                            *
In the Matter of the Arbitration                            *
                                                            *
        between                                             *
                                                            *
LAKEN SHIPPING CORPORATION, Claimant                        *
                                                            *
        and                                                 *     APPENDIX A
                                                            *
KELLSTONE, INC. and INLAND BULK                             *
TRANSFER CO., Respondents                                   *
                                                            *
Under a Ship Sale Agreement dated                           *
March 3, 2004                                               *
                                                            *
*****************************************************        *
```

## Relevant terms of Ship Sale Agreement dated March 3, 2004

1.2 Entire Agreement. This Agreement, together with the agreements and other documents to be delivered pursuant to this Agreement, constitute the entire agreement between the Parties pertaining to the purchase of the Vessels and the Equipment and supersedes all prior agreements, letters of intent, understandings, negotiations and discussions, whether oral or written and there are no warranties, representations or other agreements between the Parties in connection with the subject matter hereof except as specifically set forth in this Agreement or any other agreements or documents to be delivered pursuant to this Agreement.

2.1 On the closing date, subject to the terms and conditions of this Agreement, the Vendors agree to sell the Vessels and the Equipment and the Purchaser agrees to buy the Vessels and Equipment for the sum of $12,000,000.00...plus the price of...bunkers and lubricating oils...

2.2 The Parties agree that the allocation of the Purchase Price for each Vessel and the Equipment is as set out in **Schedule B** attached hereto. [34]

5.1 The vessels shall be delivered to Purchaser and taken over safely afloat at the Time of Closing, in substantially the same condition as at the time of inspection by the Purchaser, fair wear and tear excepted, at safe and accessible berths or anchorages at the Delivery Port.

5.3 Except as otherwise specifically stipulated in this Agreement, the Vessels shall be delivered by the Vendors and accepted by Purchaser on an "as is, where is" basis.

---

[34] Schedule B allocated a purchase price for the *FRANK PALLADINO, JR.* of $1,850,000.00.

11.1 The Vessels, together with everything belonging to them, shall be at the Vendors' risk and expense until the Time of Closing.

11.2 Until the Time of Closing, the Vendors shall maintain hull and machinery insurance on each vessel for an amount not less than the amount shown in Schedule D, which the Vendors jointly and severally represent and warrant are the current amounts of insurance maintained on the Vessels.

11.4 In the event that any substantial damage occurs to any Vessel prior to the Time of Closing which materially affects the condition of such Vessel, Purchaser shall complete the transaction with respect to the remaining Vessels but may, at its option, either decline to complete the transaction with respect to such Vessel (in which case the Purchase Price shall be adjusted by deleting the portion of the Purchase Price attributable to such Vessel) or accept an assignment from the Vendors of the insurance proceeds (not exceeding the Purchase Price of the Vessel) and complete the purchase and sale in respect of such Vessel.

11.5 The Vendors shall indemnify the Purchaser against any damage caused to the Vessels as a result of improper or inadequate lay-up of the Vessels prior to the Closing Date. Promptly after the discovery of such damage, but in no event later than one (1) month after the discovery of such damage, the Purchaser shall provide the Vendors with notice thereof and an opportunity to inspect such damage.

18.0 Disputes: In the event of a dispute between the Parties arising in connection with this Agreement, any Party may give notice to the other setting forth the particulars of the dispute and the term(s) of the contract that are involved. If the parties are unable to resolve such dispute within thirty days after receipt of such notice, then the matter shall be referred to arbitration by three persons at New York City, one to be appointed by the Vendors and one appointed by the Purchaser, and the third by the two arbitrators so chosen. The decision of the arbitrators, or that of any two of them shall be final and binding without right of appeal or judicial review, and for the purpose of enforcing any award, this Agreement may be made an order or rule of the Court. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc., New York.

21.1 No change, alteration or modification to this Agreement shall be effective unless made in writing and signed by the Parties.

```
*******************************************************
                                                *
In the Matter of the Arbitration                *
                                                *
    between                                     *
                                                *
LAKEN SHIPPING CORPORATION, Claimant            *
                                                *
        and                                     *        APPENDIX B
                                                *
KELLSTONE, INC. and INLAND BULK                 *
TRANSFER CO., Respondents                       *
                                                *
Under a Ship Sale Agreement dated               *
March 3, 2004                                   *
                                                *
*******************************************************
```

The panel's fees and expenses total $57,130, which are to be borne 80% by Kellstone and 20% by Laken. The individual fee breakdown is as follows: Manfred W. Arnold, $21,130; David W. Martowski, $17,100; Stephen H. Busch, $18,900.

With respect to the allocation of the panel's fees and expenses and the payment thereof, Kellstone is liable for the sum of $45,704 and Laken for the sum of $11,426.

The parties' current balances in the SMA escrow account including deposits and accrued interest are as follows: Kellstone, $25,481.47; Laken, $25,491.53. The total of $50,973 is to be distributed equally to the arbitrators, each receiving the sum of $16,991. Since Kellstone's available balance is insufficient to cover its share of the fees, the panel directs Laken to cover the shortfall from its balance together with direct additional payments to the arbitrators of $4,139 to Mr. Arnold, $109 to Mr. Martowski and $1,909 to Mr. Busch.

All payments to the panel are to be made within ten (10) days from the date of this award. Once these payments are made, Laken is entitled to a claimover against Kellstone in the amount of $20,222.53, which we have included in our award.