Ship Sale Agreement

THIS AGREEMENT is made the 3rd day of March, 2004

B E T W E E N:

KELLSTONE INC. and INLAND BULK TRANSFER CO., INC.,

Corporations incorporated pursuant to the laws of the State of Ohio
(Hereinafter each a "Vendor" and collectively, the "Vendors")

- and -

LAKEN SHIPPING CORPORATION,

A Corporation incorporated pursuant to the laws of the State of Delaware
(Hereinafter the "Purchaser")

Whereas, the Vendors have agreed to sell and the Purchaser has agreed to buy the tugs known as *James Palladino*, *Frank Palladino*, *Jr.* and *Benjamin Ridgway* and the barges known as *Kellstone 1* and *Inland #2401*, more particularly described in <u>Schedule A</u>, attached hereto (each a "Vessel" and collectively, the "Vessels") together with the spare parts and spare equipment described in <u>Schedule C</u>, attached hereto (the "Equipment"), on the terms and conditions contained herein;

Now, therefore, in consideration of the agreements contained herein and other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged) all the Parties do mutually covenant and agree with each other as follows:

1.0    Interpretation

1.1    <u>Definitions.</u>  In this Agreement, unless the context otherwise requires, the following terms shall have the following meanings:

"Agreement" means this Ship Sale Agreement, and all Schedules and documents incorporated by reference herein;

"Business Day" means any day on which banks are generally open for business in New York;

"Closing Date" means March 3, 2004, or such other date as the Parties hereto may mutually agree in writing;

"Delivery Port" means (i) for the tugs *James Palladino* and *Benjamin Ridgway* and the *Kellstone 1* barge, the Cuyahoga County River Dock located at Cleveland, Ohio and (ii) for the tug *Frank Palladino*, *Jr.* and the *Inland #2401* barge, the Putnam Street Dock located at Sandusky, Ohio;

"Party" means a party to this Agreement and "Parties" means two or more Parties to this Agreement;

"Purchase Price" has the meaning ascribed thereto in clause 2.1;

"Time of Closing" means 10:00 a.m. Eastern Daylight Savings Time on the Closing Date.

Ship Sale Agreement

2

**1.2    Entire Agreement.**  This Agreement, together with the agreements and other documents to be delivered pursuant to this Agreement, constitute the entire agreement between the Parties pertaining to the purchase of the Vessels and the Equipment and supersedes all prior agreements, letters of intent, understandings, negotiations and discussions, whether oral or written and there are no warranties, representations or other agreements between the Parties in connection with the subject matter hereof except as specifically set forth in this Agreement or any other agreements or documents to be delivered pursuant to this Agreement.

**1.3    Extended Meanings.**  In this Agreement, words importing the singular number include the plural and vice versa; words importing the masculine gender include the feminine and neuter genders.

**1.4    Headings.**  The division of this Agreement into sections, clauses, paragraphs and sub-paragraphs, and the insertion of headings, are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

**1.5    References.**  References to a section, clause, paragraph, sub-paragraph, schedule or table shall be construed as a reference to a section, clause, paragraph, sub-paragraph, schedule or table to this Agreement, unless the context otherwise requires.

**1.6    Governing Law.**  This Agreement shall be governed and construed in accordance with the laws of the State of New York, without regard to the principles of conflicts of laws, except in so far as this Agreement relates to issues relating to United States citizenship as defined in Section 2 of the Shipping Act, 1916, the recordation of instruments of transfer and/or mortgages with the United States Coast Guard and issues within the admiralty jurisdiction of the Federal Courts, which shall be governed by and construed in accordance with, United States Federal and admiralty law.

**1.7    Currency.**  The word "dollar" and "$" sign refer to United States currency.

**1.8    Schedules.**  The following is a list of schedules attached to and incorporated into this Agreement by reference and deemed to be a part of this Agreement:

| | | |
|---|---|---|
| Schedule A | - | Details of Vessels |
| Schedule B | - | Purchase Price Allocation |
| Schedule C | - | Spare Parts and Equipment |
| Schedule D | - | Insured Values |
| Schedule E | - | Protocol of Delivery and Acceptance |
| Schedule F | - | Inventory of Bunkers and Lubricants |
| Schedule G | - | Encumbrances on *Inland #2401* |

2.0    Purchase and Sale

2.1    On the Closing Date, subject to the terms and conditions of this Agreement, the Vendors agree to sell the Vessels and the Equipment, and the Purchaser agrees to buy the Vessels and the Equipment for the sum of $12,000,000.00 (twelve million dollars), plus the price of the bunkers and lubricating oils as more fully described on **Schedule F** of this Agreement, in immediately available funds to an account designated by the Vendors (the "Purchase Price").

2.2    The Parties agree that the allocation of the Purchase Price for each Vessel and the Equipment is as set out in **Schedule B** attached hereto.

## 3.0    Conditions of Closing

3.1    Purchaser shall not be obligated to complete the purchase contemplated herein unless on the Closing Date, each of the following conditions shall have been satisfied, it being understood that said conditions are included for the exclusive benefit of Purchaser and may be waived in writing, in whole or in part, by the Purchaser at any time prior to Closing Date:

(a)    the sale and purchase herein provided for shall have been duly authorized and approved by each Vendor;

(b)    all representations and warranties of the Vendors contained in the Agreement shall be true and correct in all material respects on the Closing Date;

(c)    all of the terms, covenants and agreements set forth in this Agreement to be complied with or performed by the Vendors at or before the Closing Date shall have been complied with;

(d)    Purchaser having obtained all material requisite regulatory approvals for the purchase and operation of the Vessels at least 15 days prior to the Closing Date;

(e)    the execution by SMT (USA) Inc. and Lafarge North America Inc. of a ten-year transportation agreement for the full utilization of the Vessels (the "Lafarge Transportation Agreement"); and

(f)    the Vessels shall be delivered to the Purchaser at the time and in the manner provided for in Article 5 of this Agreement.

3.2    If any of the foregoing conditions shall not have been fulfilled on or before the Closing Date, Purchaser may terminate this Agreement by notice in writing to the Vendors in which event Purchaser shall be released from all obligations under this Agreement, and unless Purchaser can show that the condition relied upon could reasonably have been performed by the Vendors, the Vendors shall also be released from all obligations hereunder; provided that Purchaser shall be entitled to waive compliance with any such condition, in whole or in part, at its sole discretion.

3.3    The Vendors shall not be obligated to complete the transaction contemplated herein unless on the Closing Date, each of the following conditions shall have been satisfied, it being understood that the said conditions are included for the exclusive benefit of the Vendors and may be waived in writing, in whole or in part, by the Vendors at any time:

(a)    the sale and purchase herein provided for shall have been duly authorized and approved by Purchaser;

(b)    all representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects on the Closing Date;

(c)    all of the terms, covenants and agreements set forth in this Agreement to be complied with or performed by Purchaser at or before the Closing Date shall have been complied with;

(d)    the execution by Kellstone, Inc. and River Dock, Inc., each an Ohio corporation, of an Asset Purchase Agreement and related agreements with Lafarge North America Inc. for the sale of certain assets (the "Lafarge Transaction"); and

(e)    the Purchase Price shall have been paid.

3.4   If any of the foregoing conditions shall not have been fulfilled on or before the Closing Date, the Vendors may terminate this Agreement by notice in writing to Purchaser in which event the Vendors shall be released from all obligations under this Agreement, and unless the Vendors can show that the condition relied upon could reasonably have been performed by Purchaser, Purchaser shall also be released from all obligations hereunder; provided that the Vendors shall be entitled to waive compliance with any such condition, in whole or part, at their sole discretion.

4.0   Closing

4.1   The sale of the Vessels by the Vendors and the purchase of the Vessels by the Purchaser shall be completed at the offices of the Vendors' attorneys, Benesch, Friedlander, Coplan & Aronoff LLP, 2300 BP Tower, 200 Public Square, Cleveland, Ohio 44114, at the Time of Closing.

4.2   At the Time of Closing, the Vendor of each Vessel shall deliver to Purchaser:

(a)   a bill of sale for each Vessel, duly executed by the respective Vendor, in the form of the Coast Guard Form CG-1340;

(b)   a current copy of the Certificate of Ownership of each Vessel issued by the Coast Guard on Form CG-1330, stating that the Vessel is free from registered Encumbrances, except for those Encumbrances on the *Inland #2401* listed on **Schedule G**;

(c)   Other than the tug Benjamin Ridgway and the barge Kellstone 1, confirmation of Class of each Vessel, issued by the Vendors within 72 hours prior to Closing Date;

(d)   a Load Line Certificate for the barge Kellstone 1;

(e)   an International Load Line Certificate for the Frank Palladino, Jr.;

(f)   a bill of sale for the Equipment, duly executed by the Vendors, in a form acceptable to Purchaser;

(g)   the original Certificate of Documentation or Affidavit of Lost Certificate of Documentation, as the case may be, of each Vessel;

(h)   a Certificate, signed by a duly-authorized officer of the Vendor, certifying that:

(i) the transactions contemplated by this Agreement have been duly approved and authorized by the Vendor and attaching a certified copy of the resolution of the Directors of the Vendor approving such transactions; and

(ii) the person or persons executing this Agreement and the other documents to be delivered by the Vendor pursuant to this Agreement holds the office indicated and that his, her or their signature shown on such Certificate is his, her or their true signature.

(i)   a certificate of good standing, dated as of a recent date, for each of the Vendors; and

(j)   any such additional documents as may reasonably be required by the competent authorities for the purpose of registering, licensing or operating the Vessel.

Ship Sale Agreement

5

4.3   At the Time of Closing, the Purchaser shall deliver to the Vendors:

(a)   a certificate of good standing, dated as of a recent date for the Purchaser;

(b)   a certificate, signed by a duly-authorized officer of the Purchaser, certifying that:

(i) the transactions contemplated by this Agreement have been duly approved and authorized by the Purchaser and attaching a certified copy of the resolution of the Directors of the Purchaser approving such transactions; and

(ii) the person or persons executing this Agreement and the other documents to be delivered by the Purchaser pursuant to this Agreement holds the office indicated and that his, her or their signature shown on such Certificate is his, her or their true signature.

4.4   At the Time of Closing, the Vendors and the Purchaser shall sign and deliver to each other a Protocol of Delivery and Acceptance, confirming the date and time of delivery of the Vessels from the Vendors to the Purchaser in the form attached as **Schedule E**.

4.5   Subject to the terms and conditions of this Agreement, the Purchase Price shall be paid in full at the Time of Closing by certified bank draft or wire transfer to the Vendors as they may jointly direct.

5.0   Delivery

5.1   The Vessels shall be delivered to Purchaser and taken over safely afloat at the Time of Closing, in substantially the same condition as at the time of inspection by the Purchaser, fair wear and tear excepted, at safe and accessible berths or anchorages at the Delivery Port.

5.2   The Vessels shall be delivered in Class, with no conditions or requirements on their classification certificates, (unless otherwise agreed between the Parties) and with current valid certificates issued by United States government, Coast Guard and regulatory authorities and the Vessels' classification society(ies).

5.3   Except as otherwise specifically stipulated in this Agreement, the Vessels shall be delivered by the Vendors and accepted by Purchaser on an "as is, where is" basis.

5.4   After the Time of Closing and until the commencement of the navigation season, the Purchaser shall be entitled to keep the Vessels in their current winter lay-up berths at the Delivery Ports, at the Purchaser's sole risk and expense. Purchaser shall be entitled to assume the Vendors' lay-up arrangements and all costs and expenses associated therewith and the Vendors will provide the Purchaser with such reasonable assistance as the Purchaser may reasonably require (including the assignment of berthing, ship-keeping, maintenance or security contracts) in order to keep the Vessels properly laid up until the commencement of the navigation season. The Purchaser shall indemnify the Vendors for any charges incurred by the Vendors with respect to the Vessels after the Time of Closing until the Vessels leave their lay-up berths.

6.0   Spares and Bunkers

6.1   The Vendors shall deliver the Vessels to Purchaser with everything belonging to them on board and on shore necessary for the operation of the Vessels as conducted by the Vendors prior to the Closing Date, including the Equipment referred to in **Schedule C**.

6.2   The Vendors shall not be required to replace spare parts including spare shafts and spare propellers or propeller blades which are taken out of spare and used as replacements prior to delivery, but the replaced items shall become the property of Purchaser.

6.3   Unused stores and provisions located on board the Vessels on the Closing Date shall be included in the sale and taken over by Purchaser without extra payment.

6.4   Purchaser shall remove all parts, spares, stores and provisions sold pursuant to this Agreement and located on shore within thirty (30) days after the Closing Date, failing which the Vendors may arrange removal and shipment to Purchaser at Purchaser's cost. After the Time of Closing, such parts, spares, stores and provisions shall be at the risk of Purchaser and the Vendors shall not be liable for any loss or damage to same, howsoever arising.

6.5   The personal belongings of the captain, officers and crew are to be excluded from the sale of the Vessels.

6.6   To the extent available, the Vendors' manuals, instructions and procedures shall remain with the Vessels and shall be transferred to the Purchaser.   No liability shall attach to the Vendors as a result of Purchaser's reliance upon such documents.

6.7   Purchaser shall take over the remaining bunkers and unused lubricating oils in storage tanks, sealed drums and engine sumps which are on board the Vessels at the Time of Closing as stated on the inventory attached as **Schedule F** at the prices shown on that Schedule.

7.0   Cargo on Board

7.1   The Vessels shall be delivered to the Purchaser free of any cargo on board.   In the event that cargo is found on board, title to any such cargo on board the Vessels shall not pass to Purchaser pursuant to this Agreement and Purchaser will promptly return such cargo to the Vendors, at the Vendors' expense.

8.0   Records

8.1   At the Time of Closing, the Vendors shall deliver to Purchaser the classification certificates for the Vessels as well as all other certificates, technical documentation, plans and drawings, including electronic records thereof pertaining to the Vessels, which are on board the Vessels or ashore. The Vendors shall be entitled to retain the Vessels' log books, but Purchaser shall have the right to make copies of same at Purchaser's sole expense.   No liability shall attach to the Vendors as a result of Purchaser's reliance upon such documents.

9.0   Encumbrances

9.1   The Vendors jointly and severally represent and warrant that: (a) they own the Vessels at the Time of Closing, and that, except as set forth in **Schedule G** with respect to the *Inland #2401*, at the Time of Closing the Vessels will be free and clear from all (whether pending or threatened) charters, actions, suits, legal proceedings, orders, writs, injunctions, investigations, claims, debts, obligations, liens (including maritime liens and possessory liens), mortgages, charges and encumbrances or debts of whatsoever nature and kind and whether known to the Vendors or not ("Encumbrances"); and (b) that the encumbrances set forth in **Schedule G** with respect to the *Inland #2401* are not the subject of and will not result in any actions, suits, legal proceedings, orders, writs, injunctions, investigations,

or claims against the *Inland #2401*. The foregoing representations and warranties shall survive the closing of this Agreement. The Vendors hereby undertake to indemnify Purchaser against all claims made against the Purchaser or the Vessels as a result of any Encumbrances or any of the encumbrances set forth in Schedule G, which accrued or attached to any of the Vessels prior to the Time of Closing.

**10.0   Taxes and Fees**

10.1  Any fees and expenses in connection with the purchase and registration of the Vessels shall be for the account of the Purchaser.

10.2  The Purchaser shall be solely liable for and shall indemnify Vendor for and shall pay when due all taxes and duties whatsoever imposed by reason of the purchase and sale of the Vessels provided, however, that Purchaser shall not be liable for, and shall not be required to indemnify any Vendor for, taxes attributable to the income of such Vendor as a result of this transaction or otherwise.

10.3  Personal property taxes for year 2004 with respect to the Vessels and any other assets acquired by Purchaser will be prorated between the Vendors and Purchaser as of the Time of Closing. Purchaser will be responsible for and pay to Vendors within fifteen (15) days of the filing of the Vendors year 2004 personal property tax return(s) the portion of the 2004 tax liability on the assets described above determined by multiplying the full year 2004 tax on those assets by the ratio of the number of days in 2004 after the Time of Closing divided by three hundred and sixty-six (366) days.

**11.0   Insurance**

11.1  The Vessels, together with everything belonging to them, shall be at the Vendors' risk and expense until the Time of Closing.

11.2  Until the Time of Closing, the Vendors shall maintain hull and machinery insurance on each Vessel for an amount not less than the amount shown in Schedule D, which the Vendors jointly and severally represent and warrant are the current amounts of insurance maintained on the Vessels.

11.3  In the event that either or both of the tug "James Palladino" or the barge "Kellstone 1" become an actual, constructive or compromised total loss before the Time of Closing, the Purchaser shall be entitled to terminate this Agreement and the Purchaser shall be released from all obligations under this Agreement. In the event that any of the other Vessels become an actual, constructive or compromised total loss before the Time of Closing, the Purchase Price shall be adjusted by deleting the portion of the Purchase Price attributable to such Vessel.

11.4  In the event that any substantial damage occurs to any Vessel prior to the Time of Closing which materially affects the condition of such Vessel, Purchaser shall complete the transaction with respect to the remaining Vessels but may, at its option, either decline to complete the transaction with respect to such Vessel (in which case the Purchase Price shall be adjusted by deleting the portion of the Purchase Price attributable to such Vessel) or accept an assignment from the Vendors of the insurance proceeds (not exceeding the Purchase Price of the Vessel) and complete the purchase and sale in respect of such Vessel.

11.5  The Vendors shall indemnify the Purchaser against any damage caused to the Vessels as a result of improper or inadequate lay-up of the Vessels prior to the Closing Date. Promptly after the discovery of such damage, but in no event later than one (1) month after the discovery of such damage, the

Ship Sale Agreement

Purchaser shall provide the Vendors with notice thereof and an opportunity to inspect such damage.

## 12.0  Name and Markings

12.1  Within a reasonable time after the Time of Closing, and prior to the commencement of the navigation season, Purchaser will, at its sole expense, permanently remove from the Vessels any and all reference to the Vendors' name, markings and trade marks and will change the names of the Vessels and alter their funnel and other markings, to names and markings which are substantially different from their present names and markings and which contain no reference to the Vendors or to their registered trade marks or names.

12.2  As soon as practicable after the Closing Date, Purchaser covenants to file change of name forms in the appropriate offices of the Coast Guard's National Vessel Documentation Center and further covenants to provide the Vendors with satisfactory evidence thereof.

## 13.0  Remedies for Breach

13.1  In the event of any material breach of warranty by the Purchaser on or prior to the Closing Date or default by the Purchaser of this Agreement, the Vendors shall be entitled to terminate this Agreement and this Agreement shall be null and void.  The Vendors shall be entitled to claim compensation for any losses, damages or expenses incurred as a result of Purchaser's breach of this Agreement including, but not limited to, any losses, damages or expenses that have been incurred or may result in connection with the Lafarge Transaction as a result of Purchaser's failure to pay the Vendors.

13.2  In the event of any material breach of warranty by either of the Vendors on or prior to the Closing Date or default by the Vendors of this Agreement Purchaser shall be entitled to terminate this Agreement and this Agreement shall be null and void.  Purchaser shall also be entitled to claim compensation from the Vendors, jointly and severally, for any losses, damages or expenses incurred as a result of the Vendors' breach of this Agreement, including, but not limited to, any losses, damages or expenses that have been incurred or may result in connection with the Lafarge Transportation Agreement.

## 14.0  Representations and Warranties

14.1  The Vendors jointly and severally represent and warrant to Purchaser as follows:

(a)    that the Vendors are each duly incorporated, organized validly existing and in good standing under the laws of the State of Ohio, and each has the power to own its properties and conduct its businesses as and where they are presently conducted, and each has the necessary corporate power and authority to execute, deliver and perform this Agreement and each agreement and instrument executed and delivered or to be executed and delivered by it pursuant thereto.

(b)    that neither the execution and delivery of this Agreement or any other agreement or instrument to be executed or delivered by the Vendors hereunder, nor the fulfillment or compliance with any of the terms hereof, nor the consummation of the transactions contemplated hereby or thereby, will (i) violate any provision of any material law, rule or regulation, order judgment or decree to which the Vessels are subject or bound, (ii) violate, conflict with or result in a breach of the articles of incorporation or regulations of either of the Vendors, or (iii) violate any provision of any material contract, agreement or license to which the Vessels are subject or bound.

Ship Sale Agreement

(c)   that none of the vessels are subject to any transfer or operational restrictions or other agreements imposed by the Department of Transportation, Maritime Administration, or other U.S. Federal agency or administration, including, but not limited to, restrictions on transfer or operation imposed under a Capital Construction Fund Agreement entered into pursuant to the Merchant Marine Act, 1936, as amended, or any agreement under Title XI of the Merchant Marine Act, 1936, as amended, or other similar initiative.

(d)   that, on and as of the Closing, each Vendor (i) is not, and has not been, a party to any collective bargaining agreement or other labor contract relating to, or arising in connection with, the Vessels or the Vessels' crews, (ii) has terminated the employment of all of its employees, and (iii) has no obligations or liabilities, or potential obligations or liabilities, for back pay, benefits or other amounts due to its employees, former employees (or their dependents) relating to such employees employment or termination, as applicable (including, but not limited to, amounts due for severance or otherwise).

14.2  Purchaser represents and warrants to each of the Vendors as follows:

(a)   that Purchaser is a corporation duly incorporated, organized validly subsisting and in good standing under the laws of its jurisdiction of incorporation, and has the power to own its properties and conduct its businesses as and where they are presently conducted, and has the necessary corporate power and authority to execute, deliver and perform this Agreement and each agreement and instrument executed and delivered or to be executed and delivered by it pursuant thereto.

(b)   that neither the execution and delivery of this Agreement or any other agreement or instrument to be executed or delivered by the Purchaser hereunder, nor the fulfillment or compliance with any of the terms hereof, nor the consummation of the transactions contemplated hereby or thereby, will (i) violate any provision of any law, rule or regulation, order, judgment or decree to which the Purchaser is subject or bound, (ii) violate, conflict with or result in a breach of the articles of incorporation or bylaws of Purchaser, or (iii) violate any provision of any contract, agreement or license to which Purchaser is subject or bound.

15.0  Disclaimer of Warranties and Representations

15.1  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE VENDORS HAVE NOT MADE AND DO NOT MAKE (NOR SHALL THE VENDORS BE DEEMED TO HAVE MADE OR TO MAKE BY VIRTUE OF THE SALE OF THE VESSELS TO PURCHASER OR ANY OTHER FACT OR CIRCUMSTANCE WHATSOEVER), TO PURCHASER OR ANY OTHER PERSON ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO ANY OF THE VESSELS, INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATIONS, OR WARRANTIES OF TITLE, OR WARRANTIES OF DESIGN, CONDITION, QUALITY, SEAWORTHINESS, MERCHANTABILITY, WORKMANSHIP, SUITABILITY OR FITNESS OR ELIGIBILITY FOR ANY TRADE OR VOYAGE OR FOR ANY OTHER USE OR PURPOSE, ALL OF WHICH REPRESENTATIONS AND WARRANTIES ARE EXPRESSLY EXCLUDED.   THERE ARE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER OF THE VENDORS WITH RESPECT TO ANY OF THE VESSELS, OTHER THAN THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, WHICH REPRESENTATIONS AND WARRANTIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER REPRESENTATIONS AND WARRANTIES OF THE VENDORS WITH RESPECT TO ANY OF THE VESSELS, WHETHER STATUTORY, WRITTEN, ORAL OR IMPLIED.   SUBJECT TO THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, PURCHASER SHALL PURCHASE AND ACCEPT ALL OF THE VESSELS AS IS, WHERE IS AND WITH ALL FAULTS AND DEFECTS, WHETHER PATENT OR LATENT, AND WITHOUT RECOURSE TO THE VENDORS ON ACCOUNT OF ANY LOSS, DAMAGE OR INJURY SUFFERED OR SUSTAINED BY PURCHASER OR ANY OTHER PERSON ON ACCOUNT OF ANY SUCH FAULT OR DEFECT WHETHER ON ANY THEORY OF

NEGLIGENCE, STRICT LIABILITY, UNSEAWORTHINESS, BREACH OF CONTRACT OR EXPRESS OR IMPLIED WARRANTY, ON WHICH ANY SUCH RECOURSE MIGHT OTHERWISE BE PURSUED.

## 16.0 Survival of Representations and Warranties; Indemnification

**16.1 Survival of Representations and Warranties.** Notwithstanding the Closing of the transactions contemplated under this Agreement, or any investigation made by or on behalf of any party to this Agreement, the representations and warranties of the Vendors and Purchaser contained in this Agreement (including all Schedules and Exhibits thereto), will survive the Closing Date for a period of two years except that the representations and warranties of the Vendors in Section 9 of this Agreement will have no expiration date. However, as to any breach of, or misstatement in, any such representation or warranty as to which the non-breaching party has given notice to the breaching party on or prior to the expiration of the applicable period, as above set forth, the same will continue to survive beyond said period, but only as to the matters contained in such notice.

**16.2 Vendors' Indemnification.** The Vendors will jointly and severally indemnify and save harmless Purchaser and its subsidiaries, shareholders, directors, officers, employees and agents from any and all costs, expenses, losses, damages and liabilities (including, without limitation, reasonable legal fees and expenses) (collectively, the "Damages") incurred or suffered, directly or indirectly, by any of them resulting from or attributable to (a) the breach of, or misstatement in, any one or more of the representations or warranties of the Vendors made in or pursuant to this Agreement; or (b) any claims, demands, suits, investigations, proceedings or actions by any third party containing or relating to allegations that, if true, would constitute a breach of, or misstatement in, any one or more of the representations or warranties of the Vendors made in or pursuant to this Agreement.

**16.3 Defense of Claim.** In case Purchaser has received actual notice of any claim asserted or any action or administrative or other proceeding commenced in respect of which claim, action or proceeding indemnity properly may be sought against the Vendors pursuant to this Agreement, Purchaser will give notice in writing to the Vendors. Within ten (10) days after receipt of such notice, the Vendors may give Purchaser written notice of their election to conduct the defense of such claim, action or proceeding at their own expense, provided that Vendors acknowledge in writing that such claim, action or proceeding is a claim, action or proceeding for which the Purchaser is entitled to be indemnified under this Agreement. If the Vendors have given Purchaser such notice of election to conduct the defense, the Vendors may conduct the defense at their expense, but Purchaser will nevertheless have the right to participate in the defense, but such participation will be solely at the expense of Purchaser, without a right of further reimbursement. If the Vendors have not so notified Purchaser in writing (within the time above provided) of their election to conduct the defense of such claim, action or proceeding, Purchaser may (but need not) conduct (at the Vendors' expense) the defense of such claim, action or proceeding. Purchaser may at any time notify the Vendors of Purchaser's intention to settle, compromise or satisfy any such claim, action or proceeding (the defense of which the Vendors have not previously elected to conduct) and may make such settlement, compromise or satisfaction (at the Vendors' expense) unless the Vendors notify Purchaser in writing (within twenty (20) days (or such shorter period of time if required by the terms of the proposed settlement, but in no event less than five (5) days) after receipt of such notice of intention to settle, compromise or satisfy) of their election to assume (at their sole expense) the defense of any such claim, action or proceeding and promptly take appropriate action to implement such defense. Any settlement, compromise or satisfaction made by Purchaser, or any such final judgment or decree entered in, any claim, action or proceeding defended only by Purchaser, regardless of the amount or terms, will be deemed to have been consented to by, and will be binding on, the

Vendors as fully as though they alone had assumed the defense and a final judgment or decree had been entered in such proceeding or action by a court of competent jurisdiction in the amount of such settlement, compromise, satisfaction, judgment or decree. If the Vendors have elected under this Section 16.3 to conduct the defense of any claim, action or proceeding, then the Vendors will be obligated to pay the amount of any adverse final judgment or decree rendered with respect to such claim, action or proceeding subject to the terms of this Agreement. If the Vendors elect to settle, compromise or satisfy any claim, action or proceeding defended by them, the cost of any such settlement, compromise or satisfaction will be borne entirely by the Vendors and may be made only with the consent of Purchaser, which consent will not be unreasonably withheld. Purchaser and the Vendors will use all reasonable efforts to cooperate fully with respect to the defense of any claim, action or proceeding covered by this Section 16.3.

16.4  **Purchaser's Indemnification.** Purchaser will indemnify and save harmless the Vendors from any and all Damages incurred or suffered directly or indirectly by the Vendors resulting from or attributable to the breach of, or misstatement in, any one or more of the representations or warranties of Purchaser made in or pursuant to this Agreement to the same extent as provided in clauses (a) and (b) of Section 16.2, and in the same manner as provided in Section 16.3, of this Section 16.

16.5  **Indemnification Limitations.** Any of the foregoing notwithstanding, except with respect to breach by the Vendors of the representations and warranties in Section 9 of this Agreement or with respect to the indemnity contained in section 11.5 of this Agreement, (a) neither Purchaser, on the one hand, nor the Vendors, on the other hand, will have any right to indemnification unless and until the aggregate Damages indemnifiable by the indemnifying party exceed Fifty Thousand Dollars ($50,000) in which event the indemnifying party shall be liable for all such damages starting from the first dollar; and (b) the total liability of Purchaser, on the one hand, and the Vendors, on the other hand, pursuant to the provisions of this Section 16, shall not exceed the Purchase Price.

16.6  **Bulk Transfer.** The Purchaser hereby waives compliance by the Vendors with the provisions of the so-called Bulk Transfer Law of any state, if applicable, provided that the Vendors shall indemnify the Purchaser and hold it harmless from any claims against it resulting from Vendors' non-compliance with any so-called Bulk Transfer Law, if applicable.

17.0  Assignment

17.1  Subject to clause 17.2, none of the Parties hereto shall be entitled to assign any or all of its rights or obligations under this Agreement without the prior written consent of the other Parties.

17.2  The Purchaser shall be entitled to assign this Agreement, in whole or in part, to an affiliated or related entity, or to one or more lenders to secure any financing or refinancing in connection with the acquisition of the Vessels and the Equipment, provided that Purchaser will remain liable hereunder, notwithstanding any such assignment.

18.0  Disputes

18.1  In the event of a dispute between the Parties arising in connection with this Agreement, any Party may give notice to the other setting forth the particulars of the dispute and the term(s) of the contract that are involved. If the Parties are unable to resolve such dispute within thirty days after receipt of such notice, then the matter shall be referred to arbitration by three persons at New York City, one to be appointed by the Vendors and one appointed by Purchaser, and the third by the two arbitrators so chosen. The

decision of the arbitrators, or that of any two of them shall be final and binding without right of appeal or judicial review, and for the purpose of enforcing any award, this Agreement may be made an order or rule of the Court. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc., New York.

19.0   Notices

19.1   All notices required or permitted to be given under this Agreement shall be in writing and delivered by hand, mailed by registered first-class airmail postage prepaid, or sent by facsimile telecommunication with confirmation of transmittal from the transmitting machine to:

(a)   Vendors at the following address:

> J.A.P. Holding Company
> 3203 Harvard Avenue
> Newburgh Hts., Ohio  44108
> Attn:  Augie Palladino
> Facsimile: (216) 883-8027

with a mandatory copy to:

> Benesch, Friedlander, Coplan & Aronoff LLP
> 2300 BP Tower
> 200 Public Square
> Cleveland, OH  44114
> Attn:  Gregg A. Eisenberg
> Facsimile:  (216) 363-4588

(b)   Purchaser at the following address:

> Laken Shipping Corporation
> One Cleveland Center
> 1375 East 9th Street
> Cleveland, OH 44114
> Attn: Gerry Grammenos
> Facsimile: 216-621-5526

with a mandatory copy to

> Thelen Reid & Priest LLP
> 701 Pennsylvania Avenue, NW
> Suite 800
> Washington, D.C. 20004
> Attn: Carl Valenstein
> Facsimile: (202) 654-1836

19.2   Any such notice shall be deemed to have been given and received:

(a)   if delivered, on the first (1st) Business Day following the date on which it was delivered;

(b)   if mailed, on the fifth (5th) Business Day following the Business Day it was posted; or

(c)   if given by facsimile telecommunication, on the first (1st) Business Day following the day it was transmitted.

19.3   No Party shall mail any notice during any period when postal workers are on strike or if a strike is imminent, but shall deliver such notice by hand or by facsimile.

19.4  Either Party may change its address for notice by giving written notice of the change to the other Party.

## 20.0  Binding on Successors and Assigns

20.1  This Agreement shall enure to the benefit of and be binding upon the respective successors and permitted assigns of the Parties.

## 21.0  Amendment

21.1  No change, alteration or modification to this Agreement shall be effective unless made in writing and signed by the Parties.

21.2  No departure from or waiver of any provision of this Agreement shall be deemed to authorize any prior or subsequent departure or waiver and a Party shall not be obligated to continue any departure or waiver or to permit any subsequent departure or waiver.

## 22.0  Further Assurances

22.1  The Parties shall with reasonable diligence do all things and provide all reasonable assurances as may be required to complete the transactions contemplated by this Agreement, and each Party shall provide, or execute and deliver, such further documents or instruments required by any other Party as may be reasonably necessary or desirable to give effect to this Agreement and carry out its provisions, whether before or after the Closing Date.

## 23.0  Counterparts

23.1  This Agreement may be executed by the Parties in one or more counterparts, each of which when so executed shall be an original and such counterparts shall together constitute one and the same instrument.  Facsimile signatures shall be deemed to have the same effect as originals.

## 24.0  Fees and Expenses

24.1  Each Party shall be responsible for its own legal and accounting fees and other charges incurred in connection with the preparation of this Agreement, the negotiations completed by the Parties and the consummation of the transactions contemplated herein.

## 25.0  Time of the Essence

25.1  Time shall be of the essence in all respects of this Agreement.

## 26.0  No Broker

26.1  Each of the Parties represents and warrants to the other that all negotiations relating to this Agreement and the transactions contemplated by this Agreement have been carried on between them directly, without the intervention of any other Party in such manner as to give rise to any valid claim against any of the Parties for a brokerage commission, finder's fee or any other like payment.

## 27.0  Confidentiality

27.1  Prior to the Closing Date, no party to this Agreement will issue or cause to be issued any publication or press release or other public announcement with respect to this Agreement or the transactions contemplated hereunder. This Agreement is confidential and the terms hereof shall not be disclosed to any other person or corporation, except as may be required by law or by regulatory authorities.

Ship Sale Agreement                                                        14

28.1  Severability

28.1  If any provision of this Agreement is held invalid or unenforceable, the
other provisions of this Agreement will remain in full force and effect.  Any
provision of this Agreement held invalid or unenforceable only in part or
degree will remain in full force and effect to the extent not held invalid or
unenforceable.

IN WITNESS WHEREOF all the Parties have duly executed this Agreement as of the
date first written above.

KELLSTONE INC.

By: _____
      Name: August Palladino
      Title: Vice President

INLAND BULK TRANSFER CO., INC.

By: _____
      Name: August Palladino
      Title: Vice President

LAKEN SHIPPING CORPORATION

By: _____
      Name: Gerald Grammenos

Ship Sale Agreement

Schedule A

Description of Vessels

| Name of Vessel | Owner | Official No | Tonnage | | Dimensions | | |
|---|---|---|---|---|---|---|---|
| | | | Gross | Net | L | B | D |
| James Palladino | Inland Bulk Transfer Co., Inc. | 1082214 | 392 | 117 | 105.2 | 34.0 | 15.2 |
| Frank Palladino, Jr. | Inland Bulk Transfer Co., Inc. | 619166 | 88 | 67 | 94.0 | 32.0 | 10.6 |
| Benjamin Ridgway | Kellstone Inc. | 521533 | 39 | 27 | 48.3 | 18.1 | 7.3 |
| Kellstone 1 | Inland Bulk Transfer Co., Inc. | 274472 | 6,280 | 5,024 | 390.0 | 71.0 | 27.0 |
| Inland #2401 | Inland Bulk Transfer Co., Inc. | 515154 | 2,589 | 2,589 | 240.1 | 72.1 | 14.0 |

Ship Sale Agreement

ii

## Schedule B

### Allocation of Purchase Price
### (VESSELS & EQUIPMENT)

| Vessel Name | Inland Bulk, Inc. | Kellstone, Inc. | Total |
|---|---|---|---|
| James Palladino | 3,600,000 | – | 3,600,000 |
| Frank Palladino, Jr. | 1,850,000 | – | 1,850,000 |
| Kellstone 1 | 6,000,000 | – | 6,000,000 |
| Inland #2401 | 380,000 | – | 380,000 |
| Benjamin Ridgway | – | 150,000 | 150,000 |
| Equipment & Spare Parts | 20,000 | – | 20,000 |
| Total Proceeds | 11,850,000 | 150,000 | 12,000,000 |

Ship Sale Agreement

Schedule C

Parts and Equipment

| Vessel | Item | Location |
|--------|------|----------|
| Frank Palladino, Jr. | 1 Piston with connecting Rod<br>2 Cylinder<br>1 Blank Shaft<br>1 Turned Shaft<br>Few Cylinders | Sandusky Facility<br>201 Putnam Street<br>Sandusky, Ohio<br>48870 |
| Benjamin Ridgway | 2 Propellers | Sandusky Facility<br>201 Putnam Street<br>Sandusky, Ohio<br>48870 |
| James Palladino | #3516 Cat<br>1 Cylinder liner &<br>Piston & Rod<br>2 Heads<br>1 Blower | Sandusky Facility<br>201 Putnam Street<br>Sandusky, Ohio<br>48870 |
| Kellstone 1 | Rolls Plastic Lining | Sandusky Facility<br>201 Putnam Street<br>Sandusky, Ohio<br>48870 |

Ship Sale Agreement

iv

## Schedule D: Insured Values

| Name of Vessel | Insurer | Agreed Value | Amount Insured |
|---|---|---|---|
| James Palladino | Royal Insurance Company of America Policy 013228 | $4,500,000 | $4,500,000 |
| Frank Palladino, Jr. | Royal Insurance Company of America Policy 013228 | $2,300,000 | $2,300,000 |
| Benjamin Ridgway | Royal Insurance Company of America Policy 013228 | $195,000 | $195,000 |
| Kellstone 1 | Royal Insurance Company of America Policy 013228 | $7,500,000 | $7,500,000 |
| Inland #2401 | Royal Insurance Company of America Policy 013228 | $500,000 | $500,000 |

Ship Sale Agreement

Schedule E-1

Delivery Locations

| Name of Vessel | Delivery Port |
|---|---|
| James Palladino | Cuyahoga County River Dock, Cleveland, Ohio |
| Frank Palladino, Jr. | Putnam Street Dock, Sandusky, Ohio |
| Benjamin Ridgway | Cuyahoga County River Dock, Cleveland, Ohio |
| Kellstone 1 | Cuyahoga County River Dock, Cleveland, Ohio |
| Inland #2401 | Putnam Street Dock, Sandusky, Ohio |

vi

Ship Sale Agreement                                                    vii

Schedule E-2


Parts and Equipment


| Vessel | Item | Location |
|---|---|---|
| Frank Palladino, Jr. | 1 Piston with connecting Rod<br>2 Cylinder<br>1 Blank Shaft<br>1 Turned Shaft<br>Few Cylinders | Sandusky Facility<br>201 Putnam Street<br>Sandusky, Ohio<br>48870 |
| Benjamin Ridgway | 2 Propellers | Sandusky Facility<br>201 Putnam Street<br>Sandusky, Ohio<br>48870 |
| James Palladino | #3516 Cat<br>1 Cylinder liner &<br>Piston & Rod<br>2 Heads<br>1 Blower | Sandusky Facility<br>201 Putnam Street<br>Sandusky, Ohio<br>48870 |
| Kellstone 1 | Rolls Plastic Lining | Sandusky Facility<br>201 Putnam Street<br>Sandusky, Ohio<br>48870 |

Ship Sale Agreement                                                     viii

## SCHEDULE F

### INVENTORY OF BUNKERS AND LUBRICANTS

| | | | | |
|---|---|---|---|---|
| 1) | James Palladino Tug | Fuel - 26,000 gallons @ 1.0317 gallon = | $ | 26,824.20 |
| | | 1200 Engine Oil @ 4.92 = | $ | 5,901.00 |
| 2) | Kellstone 1 Barge | Fuel – 500-600 @ 1.0317 gallon = | $ | 619.02 |
| | | Antifreeze – 60 gallons @ 4.89 gallon = | | 293.80 |
| | | Hyd. Oil – 60 gallons = | | 184.80 |
| | | Engine Oil – 110 gallons | | 541.20 |
| 3) | Frank Palladino, Jr. | Approximately 11,597 gallons @ | | |
| | | 1.0317 gallon = | $ | 11,964.62 |
| | | Engine Oil – Nil gallons | | |
| 4) | Inland #2401 | None | $ | 0 |
| 5) | Benjamin Ridgway | Diesel Fuel 250 gallons @ $1.00 gallon | $ | 250.00 |
| | | Sub-total | $ | 46,578.64 |
| | Less Agreed Holdback | | $ | 20,000.00 |
| | | Total | $ | 26,578.64 |

Ship Sale Agreement

ix

## SCHEDULE G

### ENCUMBRANCES ON *INLAND #2401*

1.  Lien, dated August 16, 1986, granted by Stevens Towing Co., Inc. in favor of DMH Leasing, Inc.

2.  Lien, dated August 16, 1986, granted by Stevens Towing Co., Inc. in favor of S&G Contractors, Inc.

3.  Lien, dated August 16, 1986, granted by Stevens Towing Co., Inc. in favor of Bengal Marine, Inc.