```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
LAKEN SHIPPING CORPORATION,                 07 Civ. 8859 (BSJ)

                        Petitioner,
        -against-

KELLSTONE, INC. and INLAND BULK
TRANSFER CO.,

                        Respondents.
------------------------------------X
```

## MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION

Edward A. Keane (EK 1398)
Garth S. Wolfson (GW 7700)

    Of Counsel

MAHONEY & KEANE, LLP
Attorneys for Petitioner
LAKEN SHIPPING CORPORATION
111 Broadway, Tenth Floor
New York, New York 10006
(212) 385-1422

TABLE OF CONTENTS

*Page*

ARGUMENT..............................................................1

POINT I.     FEDERAL SUBJECT MATTER JURISDICTION IS
             PROVIDED UNDER THE FAA'S IMPLEMENTATION
             OF THE INTERNATIONAL CONVENTIONS..............1

POINT II.    THE COURT WOULD ALSO HAVE MARITIME
             JURISDICTION OVER THE UNDERLYING DISPUTE......5

CONCLUSION...........................................................10

ARGUMENT

POINT I.  FEDERAL SUBJECT MATTER JURISDICTION IS PROVIDED UNDER THE FAA'S IMPLEMENTATION OF THE INTERNATIONAL CONVENTIONS.

Under the Federal Arbitration Act, "[i]f the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this *title [9 USCS §§ 10, 11]*.  If no court is specified in the agreement of the parties, then such application may be made to the United States District Court in and for the district within which such award was made."  9 U.S.C. § 9.

Moreover, federal-question jurisdiction is provided for matters governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 ("the New York Convention"), 21 U.S.T. 2517, 330 U.N.T.S. 38, reprinted at 9 U.S.C. § 201 note (West 2004), or the Inter-American Convention on International Commercial Arbitration

of January 30, 1975 ("the Inter-American Convention"), O.A.S.T.S. No. 42, reprinted at 9 U.S.C. § 301 note. Chapter Two of the FAA, implementing the New York Convention, provides that "an action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States . . . [and] the district courts of the United States . . . shall have original jurisdiction over such action or proceeding, regardless of the amount in controversy," 9 U.S.C. § 203, and also provides for removal to federal court "where the subject matter of an action or proceeding pending in a state court relates to an arbitration agreement or award falling under the Convention." 9 U.S.C. § 205. Chapter Three of the FAA, implementing the Inter-American Convention, makes the original-jurisdiction and removal provisions of Chapter Two applicable to that Convention as well. 9 U.S.C. § 302 (stating that 9 U.S.C. §§ 202-205, and § 207, "shall apply to this chapter as if specifically set forth herein, except that for purposes of this chapter 'the Convention' shall mean the Inter-American Convention").

As a general matter, the Conventions are enforceable in United States courts where, as here, a written agreement purportedly exists that provides for arbitration in the

United States (or another signatory nation), as long as the commercial scope of the subject matter is "not entirely domestic." See 9 U.S.C. §§ 201-202, 301-302; Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc., 198 F.3d 88, 92 (2d Cir. 1999); Productos Mercantiles E Industriales, S.A. v. Faberge USA, 23 F.3d 41, 44-45 (2d Cir. 1994).

As required under the Ship Sale Agreement (SSA) entered into by the parties, arbitration in the case at bar was conducted in New York under the Rules of the Society of Maritime Arbitrators. "Pursuant to the arbitration provision of the SSA and Title 9 USC, §1 et seq., this Award may be reduced to judgment in any Court of competent jurisdiction." See, Final Award, Exhibit A1 to Keane Declaration, at 23; see also, SSA, Exhibit A1 to Keane Declaration, at ¶ 18.

As stated in the Final Award, which was attached to the Petition in this case, the matter in dispute concerns vessels "employed on the Great Lakes," and "loss of revenue arising from [LAKEN's] inability to use the vessel for three months as a result of the casualty." (Final Award, Exhibit A1 to Keane Declaration, at 2). "As contemplated during the discussions, the sale of the vessels would be conditioned upon Kellstone's sale or lease of its quarry and stone dock to LaFarge, and

-3-

Laken's execution of a 10-year contract of affreightment with LaFarge for the transportation of its stone." Id.

Moreover, "it must be remembered that at the time of the engine casualty the parties rights and obligations were governed by the [Letter of Intent, or] LOI," which was only thereafter superseded by the SSA. Id. at 14 n.19. That LOI was actually negotiated by a Canadian company, with offices in Ontario, "acting on behalf of a U.S. company, to be incorporated, in which it shall be a 25% owner." (LOI, Exhibit B to Keane Declaration, at 1). And execution "of a ten year barge transportation agreement for the full use of the assets" was made an express condition of the LOI. Id. at ¶ 4(d).

The same commitment to a "ten-year transportation agreement for the full utilization of the Vessels" was included in the SSA. (SSA, Exhibit C to Keane Declaration, at ¶ 3(e)). And an "International Load Line Certificate" was also expressly required so that the subject vessel could trade with Canadian ports. Id. at ¶ 4(e).

Clearly, international commerce was implicated by these agreements, which concerned a subject matter which was not "entirely domestic." The question of whether the LOI or the SSA might be deemed a "maritime contract" so as to

-4-

independently provide the Court with subject matter jurisdiction is thus irrelevant to the more limited and notably liberal standard under the Conventions. As such, KELLSTONE has not come forward with any authority whatsoever under the appropriate standard. And, given Congress's oft-recognized preference to facilitate arbitration and the accordingly low threshold to qualify for coverage under the Conventions, there can be no doubt that subject matter jurisdiction is afforded with respect to enforcing this Award.

**POINT II.        THE COURT WOULD ALSO HAVE MARITIME JURISDICTION OVER THE UNDERLYING DISPUTE.**

At least since <u>Norfolk S. Ry. v. James N. Kirby, Pty Ltd.</u>, 543 U.S. 14, 125 S. Ct. 385, 160 L. Ed. 2d 283 (2004), the scope of an agreement need not be purely maritime in order to qualify as a "maritime contract." "Thus, contrary to at least the terms of this Court's jurisprudence, the Supreme Court exercised admiralty jurisdiction over a contract with non-maritime components deemed to be *more* than 'incidental.'" <u>Folksamerica Reinsurance Co. v. Clean Water of New York, Inc.</u>, 413 F.3d 307, 315, 2005 A.M.C. 1747 (2d Cir. 2005).

Now, in a more relaxed approach, "courts are required to 'look to the contract's 'nature and character' to see 'whether it has 'reference to maritime service or maritime

transactions.'"  Wilhelmsen Premier Marine Fuels AS v. UBS Provedores Pty Ltd., No. 07 Civ. 5798 (CM), 2007 U.S. Dist. LEXIS 74477, *10 (Oct. 1, 2007) (quoting Folksamerica, 413 F.3d at 311 (quoting Kirby, 543 U.S. at 24 (quoting Northern Pacific S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co., 249 U.S. 119, 125, 39 S. Ct. 221, 63 L. Ed. 510 (1919))).

And, even before Kirby, courts would not simply end their inquiry upon seeing the words "Ship Sale Agreement" at the top of a contract.  A case-by-case analysis was required which often led to findings that so-called Ship Sale Agreements were, indeed, maritime contracts under the circumstances presented or were "severable," inasmuch as only certain provisions were invoked in connection with a maritime loss, thus affording the court with admiralty jurisdiction.  See, e.g., Natasha, Inc. v. Evita Marine Charters, Inc., 763 F.2d 468, 1986 A.M.C. 490 (1st Cir. 1985); Jack Neilson, Inc. v. Tug Peggy, 428 F.2d 54 (5th Cir. 1970); Flota Maritima Browning de Cuba, Sociedad Anonima v. Snobl, 363 F.2d 733 (4th Cir. 1966); see also, Compagnie Francaise de Navigation a Vapeur v. Bonnasse, 19 F.2d 777 (2d Cir.) (L. Hand, J.), cert. denied, sub nom American Exch. Irving Trust Co. v. Bonnasse, 275 U.S. 551, 118 S. Ct. 114, 72 L. Ed. 421 (1927).

In particular, "[t]he business of ship maintenance has long been recognized as maritime." Folksamerica, 413 F.3d at 313. Vessel upkeep is a maritime risk that includes "the risk of 'the loss of the ship or goods' in the language of *Dunham*, 78 U.S. (11 Wall.) at 30. It is a "risk peculiar to ship and sea as set out in *Jeffott, 129 F.2d at 584*, and is 'related to hazards encountered in maritime transportation' and vessels or the maritime industry." Id. at 320 (citations omitted). "There are few objects - perhaps none - more essentially related to maritime commerce than vessels." Sirius Ins. Co. (UK) Ltd. v. Collins, 16 F.3d 34, 37 (2d Cir. 1994).

The claim in the matter at hand is based on contractual provisions in the LOI concerning responsibility for damage to the vessel during lay-up, before the parties even entered into the final SSA. See, Final Ward, Exhibit A1 to Keane Declaration, at 1 ("This arbitration concerns the liability for what has been described as catastrophic damage to a tugboat's starboard engine."); see also id. at 4 ("Kellstone was to be responsible for the proper lay-up of the vessels for the 2003-4 winter season . . . Kellstone would indemnify Laken for any damage to them arising from improper or inadequate winter lay-up."). The contractual terms deemed by the arbitrators to be pertinent to the award largely

concerned only these provisions. See id. at 11; id. at 13 (noting KELLSTONE's "failure to lay the vessel up properly as was required by Paragraph 3(b) of the LOI."); id. at 14 n. 19; see also, LOI, Exhibit B to Keane Declaration, at ¶ 3(b); SSA, Exhibit C to Keane Declaration, at ¶ 5.4; id. at ¶ 11.5. It is beyond cavil that contracts for such services concern classically maritime risks. See, Ignazio Messina & C.S.P.A. v. Ocean Repair Air Service Co., No. 86 Civ. 7898 (KMW), 1993 U.S. Dist. LEXIS 14626, **8-9, 1994 A.M.C. 402 (S.D.N.Y. Oct. 19, 1993) (holding banks' letter agreement for purposes of "ensuring the preservation of the vessel" and "general maintenance, winterization and lay-up of the Vessel" constituted a subject-matter jurisdiction-conferring "maritime contract" as a well-settled matter of law) (citing cases).

Moreover, the remainder of the dispute placed before the arbitrators concerned LAKEN's loss of use of the vessel, implicating a contract of affreightment which was expressly called for under the LOI and the SSA. See, Final Award, Exhibit A1 to Keane Declaration, at 2 ("Claimant also seeks damages for loss of revenue arising from its inability to use the vessel for three months as a result of the casualty."); id. ("As contemplated during the discussions, the sale of the vessel would be conditioned upon Kellstone's sale or lease of

its quarry and stone dock to LaFarge, and Laken's execution of a 10-year contract of affreightment with LaFarge for the transportation of its stone."); id. at 7 ("The engine work was not done, however, nor was the vessel used during the 2004 shipping season."); id. at 9-10 ("Laken seeks damages for loss of revenue in the amount of $395,655.30, which it represents is the amount the tug could have earned during the three-month period it estimates would have been necessary to procure and install a replacement engine."). Again, there is no question that allegations of lost COA contracts would give rise to admiralty jurisdiction. See, Gulf Oil Trading Co. v. Creole Supply, 596 F.2d 515, 520 (2d Cir. 1979) ("The libel claimed that an express maritime contract existed between Gulf and Chase. Even though the District Judge found that no such express contract had come into being, it may be that the destruction of Gulf's lien interfered with its contract with the vessel owner so as to bring the obligation of Chase within the maritime jurisdiction . . . There is a maritime contract involved.").

its quarry and stone dock to LaFarge, and Laken's execution of a 10-year contract of affreightment with LaFarge for the transportation of its stone."); id. at 7 ("The engine work was not done, however, nor was the vessel used during the 2004 shipping season."); id. at 9-10 ("Laken seeks damages for loss of revenue in the amount of $395,655.30, which it represents is the amount the tug could have earned during the three-month period it estimates would have been necessary to procure and install a replacement engine."). Again, there is no question that allegations of lost COA contracts would give rise to admiralty jurisdiction. See, Gulf Oil Trading Co. v. Creole Supply, 596 F.2d 515, 520 (2d Cir. 1979) ("The libel claimed that an express maritime contract existed between Gulf and Chase. Even though the District Judge found that no such express contract had come into being, it may be that the destruction of Gulf's lien interfered with its contract with the vessel owner so as to bring the obligation of Chase within the maritime jurisdiction . . . There is a maritime contract involved.").

CONCLUSION.

WHEREFORE, LAKEN, respectfully urges the Court to deny KELLSTONE's motion to dismiss and to grant to CALDER such other and further relief as this Honorable Court may deem just and proper.

Dated:  New York, New York
        November 30, 2007

>Respectfully submitted,
>
>MAHONEY & KEANE, LLP
>Attorneys for Petitioner
>LAKEN SHIPPING CORPORATION
>
>By: _____
>Edward A. Keane (EK 1398)
>111 Broadway, Tenth Floor
>New York, New York 10006
>(212) 385-1422